PERKINS v. GIBBS et al.

(Circuit Court of Appeals, Eighth Circuit. April 30, 1907.)

No. 2,475.

1. WILLS—NATURE OF ESTATE DEVISED—VESTED REMAINDER.

Where a testator devised and bequeathed his residuary estate to his widow for life or until her remarriage, with remainder to his son and daughter in equal shares, the latter took at once a vested interest in remainder in the real estate which was alienable under the laws of Minnesota.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 49, Wills, § 1481.]

2. SAME—TRANSACTIONS BETWEEN DEVISEES—CREDITORS' SUIT—GROUNDS FOR RELIEF—SUFFICIENCY OF EVIDENCE.

A testator devised and bequeathed his estate in equal shares to his son and daughter, subject to a life interest in his widow terminable on her remarriage. All of such parties entered into a written agreement admittedly made in good faith for an amicable division of the estate, by which the widow and son, who were also executors, agreed to convey their interest in certain real estate to the daughter, and she was to convey her interest in other real estate to the son, and also to release her claim to any share of an indebtedness owing by him to the estate and to money which he had misapplied as executor. Later, when the son had become largely indebted and insolvent, he and the widow executed the conveyance to the daughter; the deed reciting that it was made in consideration and compliance with such agreement. The son obtained the property which he was to have by the agreement, and was not called upon to pay the amount which he owed the estate. *Held*, that the conveyance to the daughter was based on a good and meritorious consideration; also, on the evidence, that it was made as recited therein in good faith pursuant to the prior agreement, and not for the purpose of defrauding the son's creditors, as charged in a creditors' bill.

Appeal from the Circuit Court of the United States for the District of Minnesota.

This was a creditors' bill brought by George F. Perkins against Clara J. Gibbs, Albert L. Gibbs, her husband, the Cloquet Lumber Company, and several other defendants alleged to have some interest in the lands in controversy, to set aside certain deeds made by the judgment debtor as fraudulent. The several defendants other than those just mentioned do not appear to have been served with process. Those mentioned for their answer denied the alleged fraud and asserted that the title held by defendant Clara J. Gibbs was valid, subject only to certain timber rights existing under defendant Gibbs in favor of the Lumber Company.

The facts as disclosed by the record are substantially as follows: Reuben Whiteman died in Dansville, Livingston county, N. Y., where he had long resided, in March, 1888, leaving a widow, Rebecca, a son, Alonzo, and a daugh-

ter, Clara. He left a will which was duly probated in New York and afterwards in St. Louis county, Minn. where the land in question is situated, by which, after making certain specific legacies, he devised and bequeathed the rest and residue of his estate, real and personal, to his wife for life, or until she should again marry, and the remainder after the expiration of the wife's estate to his son and daughter in equal parts. The wife married again in 1895. Her particular estate ceased, and the son and daughter were let into the full enjoyment of their vested estate in remainder. Whiteman's estate consisted of certain personal property, a paper mill in Dansville, N. Y., some land elsewhere in New York, and about 13,000 acres of uncultivated land in Minnesota and Wisconsin. The widow and son were made executors of the will, qualified as such, and proceeded under the supervision of the Surrogate Court of Livingston county, N. Y., until after January, 1890, with the administration of the estate. On January 25th of that year, when, so far as this record discloses, there were no unsatisfied creditors of the estate and when the widow, son, and daughter were solely interested therein, they all joined in a contract providing for a voluntary partition or division of the estate, according to the respective interests of the parties. · That contract was made and executed by and between Alonzo J. Whiteman individually and as executor as party of the first part, Rebecca E. Whiteman individually and as executrix as party of the second part, and Clara J. Whiteman as party of the third part, and is in the following words:

"That for and in consideration of the mutual promises and agreements herein contained, and of the sum of one dollar by each to the other in hand paid, the receipt whereof is hereby acknowledged, it is agreed:

"First. That the parties of the first and second parts shall and will execute and deliver to the party of the third part a good and sufficient deed or deeds, quitclaiming, releasing, and conveying all their individual right, title, and interest,. and the estate and right of dower in Julia N. Whiteman, the wife of the party of the first part to the party of the third part, in and to all and singular the lands in the states of Minnesota and Wisconsin, now belonging to the estate of Reuben Whiteman, deceased, and comprising about twelve thousand nine hundred and forty (12,940) acres, and which are situated and described as follows: [Then follows a detailed description of the land and a mention of the time and place for delivery of deeds.] * * *

"Third. The party of the third part will also, at said time and place, upon accepting said deed or deeds, execute and deliver to the party of the first part a quitclaim deed for conveying and releasing all her right, title, and interest in the paper mill and the land whereon the same is built comprising less than twelve acres situate in Dansville in the state of New York, and which belongs to the estate of said Reuben Whiteman.

"Fourth. Upon the acceptance of said deed or deeds by the party of the third part at the time and place above· specified, she will, by a proper writing, waive all objections to the allowance upon an accounting of said parties of the first and second parts, as executors of said estate, of the expenditures heretofore and before the 31st day of December, 1889, actually made by them, in the construction, alteration or 'completion of said paper mill, which expenditures amount to about sixty-five thousand dollars. * * *

"Seventh. A certain agreement in writing bearing even date with this agreement, and simultaneously delivered herewith relating to certain claims and obligations belonging to said estate, shall be deemed to be a part of this agreement, and it and this agreement shall be read together as one instrument."

The agreement last referred to was duly executed by the parties, and the body of it is in the following words: "Now, as a part of said agreement and to be construed and treated as such, and for the considerations mentioned in said agreement, it is agreed that upon the execution and delivery of the deeds to the party of the third part in said agreement bearing even date herewith and their acceptance by the party of the third part as provided in said agreement the parties of the first and second parts as such executors as aforesaid, shall cancel and deliver to said first party individually and he shall be deemed absolutely discharged from all liability to the estate of Reuben Whiteman upon the following notes and obligations, including in-

terest thereupon. * * *" Here follows a statement of notes and evidences of indebtedness of Alonzo J. Whiteman to the estate of Reuben Whiteman amounting to $45,594.26. The main agreement was filed for record in the office of the register of deeds of St. Louis county, Minn., on February·4, 1890. After that contract was made, and in August, 1890, the paper mill was destroyed by fire, and the insurance thereon, amounting to about $75,000 was collected by Alonzo. Afterwards, by a quitclaim deed bearing date December 4, 1890, and recorded May 12, 1891, in the office of the register of deeds for St. Louis county, Minn., Alonzo J. Whiteman and Julia N. Whiteman, his wife, and Rebecca E. Whiteman, the widow, conveyed such of the lands referred to in the contract of January 25th as were located in the county of St. Louis, Minn., to Clara J. Whiteman. The deed, after stating who the parties are, proceeds as follows: "Witnesseth: That the said party of the first part in consideration of the sum of one dollar to them in hand paid by the said party of the second part, the receipt whereof is hereby confessed and acknowledged and in consideration and in pursuance of a certain agreement made between the parties hereto and bearing date the 25th day of January, 1890, have bargained, sold, remised and quitclaimed," etc.

On January 2, 1891, after the quitclaim deed had been executed, Alonzo J. Whiteman, individually and as executor of the will of Reuben Whiteman, as party of the first part, and Clara J. Whiteman, as party of the second part, made a supplemental contract whereby, among other things, it was recited and agreed as follows: "Whereas, the parties hereto, together with Rebecca E. Whiteman, did on the 25th day of January, 1890, make and enter into a written agreement, which agreement provided among other things for the conveyance to the party of the second part by the party of the first part, of certain real estate situate in Wisconsin and Minnesota, and the conveyance by the party of the second part of certain real estate situate in the village of Dansville, N. Y., and, whereas, in partial execution of said agreement the party of the second part is about to execute and deliver to the party of the first part a * * *· release of all her interest in the insurance moneys collected by the party of the first part from insurance companies on account of policies issued upon the buildings situate upon the real estate aforesaid in Dansville, which buildings were after the making of said agreement, destroyed by fire, and whereas the party of the first part and the said Rebecca Whiteman have executed and are about to deliver to the party of the second part conveyances of a portion of the said lands in Wisconsin and Minnesota, so contracted to be conveyed and are unable to convey certain portions thereof heretofore sold by them. * * * And the party of the second part agrees in consideration of the premises, that in case the covenants and agreements herein contained are faithfully performed by the party of the first part she will not during the life of the said Rebecca E. Whiteman, cause or in any way procure an accounting by the said party of the first part, and the said Rebecca E. Whiteman, in the surrogates court, or in any other court for or on account of their acts and doings as executors of the estate of Reuben Whiteman, deceased."

On January 23, 1892, pursuant to the provisions of the contract of January 25, 1890, requiring the executors as such to make a deed by way of further assurance of title to the land in question to Clara J. Whiteman, such a deed was duly executed and delivered to her by the executors.

After the burning of the mill Alonzo organized a corporation called the Whiteman Pulp & Paper Company, he being the owner of substantially all the capital stock. and on January 9, 1891, took a conveyance to that company from himself and his. mother as executors of the land on which the mill had been located, together with the water power, engines, boilers. machinery, and all salvage from the recent fire. The corporation proceeded to repair and reconstruct the mill, and on April 6th and afterwards it borrowed money from the firm of Perkins, Goodwin & Co., of New York, who became its sales agent to dispose of its product. It gave that firm its notes indorsed by Alonzo and Rebecca, and secured their payment by. pledge of much of its ·capital stock and by a chattel mortgage on personal property. It afterwards became financially embarrassed, owing over $100,000. The notes were not paid, Alonzo and Rebecca, the indorsers, were sued, and on March 29, 1892,

judgment was rendered against them in the Supreme Court of the state of New York for $10,083.07 in favor of the firm of Perkins, Goodwin & Co. Afterwards suit was instituted in the district court of St. Louis county, Minn., on the New York judgment against Alonzo, and on May 24, 1892, recovery was had against him in the sum of $10,271.90. In January, 1901, execution was sued out on that judgment, levy made on the title and interest of Alonzo in the real estate which had on December 4, 1890, been deeded to his sister Clara, as belonging to him. The same was sold on execution and purchased by complainant, George F. Perkins, who now brings this action to quiet and establish his title by declaring the quitclaim deed of December 4, 1890, and the executors' deed of January 23, 1892, to Clara to have been made to hinder, delay, and defraud the creditors of Alonzo and for that reason to be null and void.

On February 10, 1892, the Surrogate Court of Livingston county made an order on the petition of Clara revoking letters testamentary before that time granted to Rebecca and Alonzo and requiring them to file their final accounts. Hearing on the petition of Clara disclosed the fact that Alonzo had alone taken possession of the personal assets of the estate and, without any intervention or participation by his mother, Rebecca, had administered upon the estate. His complete final account was filed in February, 1895, showing that he owed the estate $227,000, one-half of which belonging to himself and the other to his sister, Clara. This balance consisted of $65,163.31, which Alonzo had improperly expended in improving the mill property which, by agreement between him and Clara, was his; $45,594.26, made up of the worthless claims against him which Clara, by the contract of January 25, 1890, had agreed to discharge; $74,250 insurance money which he had collected and appropriated to his own use and other items of indifferent value. Clara was then made administratrix c. t. a., and an order was made requiring Alonzo to turn over the balance found due from him to the new administratrix. Her final settlement made later discloses the fact that the total amount of all the personal property which ever came to her hands as administratrix was $4,812.57. That probably consisted of some items which she received from other sources than Alonzo. No part of the balance found due from him was ever turned over to the administratrix. Alonzo did not have it, and was hopelessly insolvent. In fact, the balance was substantially composed of worthless claims against Alonzo from whom, by reason of his insolvency, nothing could be collected, and other items, which as between himself and Clara belonged to him, namely, the insurance money and the expenditures upon the mill property. About the time this settlement was made, and on February 12, 1895, Alonzo deeded to Clara in full satisfaction of whatever claim she had against him as executor his interest in certain real estate situated in the counties of Livingston and Steuben, N. Y., the value of which is not shown, and transferred to her the remaining personal property belonging to the estate, which amounted to little or nothing.

From the foregoing detailed statement of the facts the substance may be gathered as follows: That in the adjustment from time to time of their rights in the residuary estate of their father, voluntarily made by Alonzo and Clara, the only parties interested, Alonzo received the deed to the mill property at Dansville, received the money collected from the insurance companies on account of the destruction of the mill by fire, was released from his personal obligation of about $65,000 for money improperly taken from the estate and expended in improving the mill property, and was released from his personal obligation to the estate amounting to $45,000; and Clara got the wild and uncultivated lands in Minnesota and Wisconsin and a deed to some lots of land in Livingston and Steuben counties, N. Y.

Alonzo testified that he was hopelessly insolvent in 1890 and 1892 when the quitclaim and executors' deed were made to Clara; that they were devised and executed without any consideration moving from Clara to him, but solely for the purpose of covering up his property and preventing his creditors from levying upon it in satisfaction of their debts; and that Clara participated and co-operated with him in the accomplishment of his purpose. Clara, on the other hand, explicitly denied that testimony given by Alonzo, and reiterated the statement that the deeds were made pursuant to

the contract of January 25, 1890, and in part performance of it. After hearing the evidence the Circuit Court dismissed the bill for want of equity, and the complainant appealed to this court for a reversal of that decree.

After hearing the case on the merits the Circuit Court found that complainant had no right, title, or interest in any of the lands in controversy, but that Clara J. Gibbs had a valid title thereto in fee simple, subject only to the right which she had conveyed to the lumber company, and entered a final decree enjoining complainant from asserting any claim adverse thereto.

Austin N. McGindley, for appellant.

William E. Hale (M. H. Boutelle, on the brief), for appellees.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

ADAMS, Circuit Judge, after stating the facts, delivered the opinion of the court.

Counsel for the parties in their argument and brief have extended discussion over a vast field of learning in this case; but, after a careful consideration of the facts and applicatory law, we find that the rights of the parties are solvable upon propositions of law which are indisputable and of fact which rest within a narrow compass. Upon the death of their father, and by virtue of the probate of his last will and testament, Alonzo and Clara Whiteman, his children, succeeded to a vested remainder each in and to an undivided one-half of the real estate in question in Minnesota and in and to a certain paper mill and real estate on which the same was situated and other real estate in New York, subject only to a determinable life estate in their mother, Rebecca Whiteman. Her life estate depended upon a condition subsequent that she should not again marry. In Minnesota, as elsewhere, title to real estate does not vest in the personal representatives of a deceased owner, but does on the death of the owner descend to and vest in the heirs at law or devisees subject to the possible requirement of its being needed to satisfy the debts of the deceased. The record in this case discloses no reason for consideration of the rights of creditors of the deceased. Accordingly, in 1890, the land in question was owned as follows: Rebecca had a life estate subject to be defeated by her remarriage, and Alonzo and Clara had each a vested remainder in expectancy in an undivided one-half thereto. Sections 4369, 4371, 4372, 4374, Gen. St. Minn. 1894; Debenture Co. v. Dean, 85 Minn. 473, 477, 89 N. W. 848. Rebecca's life estate was undoubtedly alienable (sections 4164, 4316), but whether so or not is of no importance because it was terminated before this suit was instituted by her remarriage. Alonzo's and Clara's estates were vested in interest, if not in possession, and as such were alienable by them. Sections 4372, 4396, Gen. St. Minn.; Debenture Co. v. Dean, supra; Lawrence v. Bayard, 7 Paige (N. Y.) 70; Griffin v. Shepard, 124 N. Y. 70, 26 N. E. 339; O'Donnell v. Smith, 142 Mass. 505, 8 N. E. 350.

Being so owned and lawfully subject to sale and disposition the only question in this case is one of fact, whether the deed duly and properly executed by Alonzo and Rebecca acting as individuals purporting to convey their right, title, and interest in the land in question to Clara on December 4, 1890, and the deed made by the same par-

ties acting as executors in the exercise of powers conferred by the will of the testator conveying the land to Clara on January 23, 1892, were devised and intended by the parties as a scheme to hinder, delay, and defraud the creditors of Alonzo, or were they made pursuant to the provisions of the contract of January 25, 1890, to separate their holdings in common into individual estates.

As the quitclaim deed effectually conveyed all the rights of Alonzo and Rebecca to Clara, little consideration need be given to the subsequent executors' deed, except to say that it evidences a harmonious and persistent purpose to carry out the provisions of the original contract, even to the extent of making a useless deed as an unnecessary assurance of Clara's title just because the grantors had agreed to do so. It shows the good faith of the original agreement.

Complainant, the purchaser of the lands under execution issued on the judgment against Alonzo, contends (1) that Alonzo, when the deeds in question were executed, was in financial straits, embarrassed, and insolvent; that Clara knew of his condition, and voluntarily became a party to a scheme to cover up his property and protect it from the rightful demands of his creditors; that to that end and for that purpose she took and held title to it in secret trust for her brother, with an understanding that, when he should get a settlement with his creditors or otherwise be released from their claims, she would reconvey it to him on demand; and (2) that Clara gave no consideration for the conveyances.

Alonzo was complainant's only witness to the making of the alleged fraudulent compact between him and his sister, and Clara was defendants' only witness on that subject. Alonzo affirmed its existence, and testified that the deeds were executed pursuant thereto. She broadly denied both those propositions. He admitted that the agreement of January 25, 1890, was made for the purpose of dividing the father's estate between himself and his sister, but said nothing was ever done under it. She testified that such was its purpose, and that the conveyances in question to her were made in part performance of that agreement. The testimony of both these witnesses was given about 15 years after the events occurred concerning which they testified. Alonzo was then or soon after, in the New York penitentiary serving a sentence for some crime committed by him, and Clara, while emphatically denying the fraudulent purpose imputed to her, appears to have been quite oblivious to most of the details of the transactions about which she testified. About all she seems to know with any certainty is that she intrusted her matters to competent counsel and followed their directions. From these unreliable sources we confidently turn to those instruments of writing and unimpeachable records which abound in this case for the truth. Both sides concede that the agreement of January 25, 1890, was executed for the purpose of making a friendly partition of the then joint interests of the children in their patrimony. That instrument, so far as we can discover, had no sinister purpose whatsoever. It was a rational and reasonable one to make. It was recorded soon after its execution in the office of the register of deeds where the land in question was situate, as notice to all persons of the incipient

rights of the parties. The two deeds now assailed were in apparent partial execution of that agreement. The quitclaim deed recites on its face that it was made "in consideration and in pursuance of a certain agreement made between the parties hereto and bearing date the 25th day of January, 1890." The practically cotemporaneous agreement of January 2, 1891, made between Alonzo and Clara, recites that Alonzo and Rebecca "have executed and are about to deliver to" Clara a conveyance of a portion of the lands in Minnesota and Wisconsin as required by the agreement of January 25, 1890. The executors' deed, as already stated, affords corroboratory proof of the good faith and intentional observance of the requirements of the original agreement obliging the executors on certain conditions therein specified to make, execute, and deliver to Clara "a sufficient executor's deed or deeds for conveying and assuring to her the fee simple title of said lands and premises free from all incumbrances." That deed recites that it was made by the executors "in consideration of the sum of one dollar and other valuable considerations to them duly paid [by Clara] the receipt whereof is hereby acknowledged." In view of such indisputable proof found on the face of the deeds and their allied writing, we have no doubt that the conveyances in question were honestly made for the purpose originally intended by the parties. The testimony of Alonzo that he and his sister deliberately entered into a scheme to cover up and conceal his property from his creditors is out of harmony with the original intention of the parties, and in the light of the fact that Alonzo owed the estate $45,000, had devoted much of the personal estate to unlawful uses, had appropriated and converted to his own use the proceeds of the fire insurance policies on the mill property, and was then hopelessly insolvent, we cannot believe that Clara would have abandoned the original purpose which alone gave her any assurance of securing an equivalent for all or a part of her imperiled interest in the personal estate of her father merely for the purpose of creating a secret trust for the benefit of her brother and to enable him to swindle his creditors. The irrationality and unreasonableness of the story condemn it.

But it is said the conveyances in question were without consideration, and for that reason void as to creditors. The facts do not warrant any such conclusion. When the deeds in question were delivered to Clara, Alonzo had not only then actually received the full agreed consideration, but, according to his own admission, was hopelessly insolvent. By the original agreement of January 25, 1890, he was to get the paper mill in Dansville and the land employed in connection with it, worth according to the brief of complainant's counsel about $150,000. He was also to secure a release and discharge from a personal obligation against him in favor of the estate for about $65,000 occasioned by his appropriating as executor that much of the personal estate for the construction, alteration, and completion of the paper mill. He was also to get a release and discharge from liability for his personal indebtedness to the estate amounting to about $45,-000. What did he actually get? The executors of the estate deeded to him the mill property, conveying to him the full legal title, which with the insurance money which he appropriated, amounting to about

$75,000, constituted all there was of the mill property. He has never been made to respond to the estate for the amount of $65,-000 which he took out of its funds and misapplied in the improvement of his mill. Neither has he ever been made to pay his debt of $45,000 which was admittedly due from him. Such are the facts, and, by whatsoever method, instrument, or conveyance the result was brought about, he is now and for 15 years last past has been in the undisputed and undisturbed enjoyment of all his promised rights and immunities under that agreement. The answer made to this showing is that in 1895 Alonzo, in complying with the order of the Surrogate Court to make a final settlement of his accounts preparatory to turning over his estate to the administratrix c. t. a., charged himself with all the items of money just referred to, and thereby recognized an obligation to the estate for them. That fact for the purposes of this case is of no consequence. As between him and Clara, the items all belonged to him, and he had appropriated them to his own use; but, as between him and the estate, the orderly course of procedure required him to make a full statement of his accounts. It is no uncommon practice in administering the estates of deceased persons for an executor to make partial distribution before final settlement; but that does not excuse a full final statement of accounts with debits against him of the full value of the estate. The fact of a preliminary distribution can afterwards be shown as an exoneration of the executor to that extent. It is also said that Clara never executed a quitclaim deed to Alonzo for the mill property as agreed; but the executors executed that deed with her assent as shown by the proof. It thus appears that the contract of January 25, 1890, has been substantially executed on both sides. Each has received substantially what he or she was entitled to get. Whether it was executed in the exact way specified in the agreement or whether formal instruments were exchanged as thereby contemplated is for the purposes of this case immaterial. We are now dealing with the substance of things, the equities between the parties, and not with technical terms or technical requirements.

On the assumption which we have shown is reasonable, that the deeds in question were made to Clara in partial execution of Alonzo's obligation under the contract of January 25, 1890, a court of equity, if necessary, would undoubtedly have compelled Clara to perform her obligations thereunder. Accordingly, for the purposes of this case, we do not concede that it was necessary to show that Clara has fully performed. The equitable obligation existed, and it was sufficient consideration for the performance by Alonzo of his part of the contract, namely, the execution of the deeds in question. But, as this case involves an issue of fraud and determination of a mental attitude, we have, as we should have done, taken a comprehensive view of all the facts and circumstances surrounding the parties in any way related to the subject under consideration, and in doing so we have found that Alonzo actually received all the money and property to which he was entitled as consideration for the deeds in question, and has never returned and never could lawfully be made to return any portion of it to Clara. From these facts we unhesitat-

ingly conclude that the deeds in question are supported by an ample and meritorious consideration. We reach this conclusion in full recognition of the fact largely relied on by complainant's counsel that Alonzo on February 12, 1895, deeded to Clara his interest in some real estate in Livingston and Steuben counties, N. Y., in full settlement of her claims against him as executor as shown by his final settlement. That deed must be taken in connection with all the other facts of the case. It does not appear how much there was in the estate properly belonging to Clara after allowing to Alonzo all that as between him and Clara belonged to him under the agreement of January 25, 1890. That uncertain element might afford full consideration for the last mentioned deed. Neither does it appear how much the real estate last referred to was worth. The conveyance taken seriously and literally may, therefore, be in no wise inconsistent with the conclusion which we have reached. But, when it is considered that by reason of Alonzo's insolvency a technical accounting and settlement as between him and Clara was of no practical importance, we may properly attribute the deed of February 12, 1895, to a disposition to close up in some conclusive way an open account between the parties at a time when enforcement of legal rights would be unproductive of any good.

Counsel for complainant argue that the quitclaim deed was never in fact delivered to Clara, but was held by Alonzo for his own convenience, and placed on record, not by Clara, but by him, to serve his own unlawful purpose of cheating and defrauding his creditors. There is no satisfactory evidence of that character; but, on the other hand, complainant's contention is effectively denied by his own pleadings. In his complaint he avers that the deed was executed and delivered to Clara, "and that said defendant Clara J. Gibbs caused said deed to be recorded in the register of deeds office in and for said St. Louis county, Minnesota, on the 12th day of May, 1891." For the purposes of this case, therefore, we must find and hold as a fact that the deed was duly delivered to Clara before May 12, 1891, and by her for her own purposes caused to be recorded. The judgment under which complainant purchased the lands in question was not rendered until May, 1892, so that it never attached to the land in question as a lien until after Clara's deed was executed and recorded, and her rights established thereunder. Several other facts are argued by counsel as important and significant in the determination of this case. To all of them, in connection with the facts already discussed, we have given diligent consideration which results in a firm conviction that the deeds in question were executed for the honest purpose of making a friendly partition of the real estate of the ancestor, and constituted neither a secret trust in favor of the grantor nor conveyances without consideration. The conclusion reached by us on these questions of fact render unnecessary the consideration of defendants' contention that, even if the deeds were void as to creditors, complainant is barred from relief in equity by his laches in failing to institute this suit for 12 years or more after the alleged fraud was committed.

The court below reached the same conclusion we have reached on the issue of fact here involved, and its decree might properly have been a simple dismissal of the bill; but, as its finding that complainant did not have any right, title, or interest in the land in question and its injunctive order restraining him from asserting any such right, title, or interest adverse to the defendants accomplish the purpose and are not complained of for irregularity, the decree as rendered is affirmed.